### McNABB v. WESTERN UNION TELEGRAPH CO.

Industrial Commission.

February 21, 1956.

John E. Mathews, Jr., McNatt & Mathews, Jacksonville, for claimant.

Harold B. Wahl, Loftin & Wahl, Jacksonville, for the employer.

HERBERT F. DARBY, Deputy Commissioner.

Hearings were conducted in Jacksonville on September 13 and November 1, 1955, the purpose of which was to determine — (1) the extent of claimant's disability to his right leg as a result of injury sustained on December 4, 1952 and (2) to determine whether his heart attack of April 1954 was caused, precipitated or aggravated by his duties as a workman.

On and prior to December 4, 1952 claimant J. B. McNabb was an employee of Western Union Telegraph Co., having been employed from February 19, 1918 until April 11, 1955, on which day he was retired.

On December 4, 1952, while employed as assistant city foreman, he suffered an injury by accident arising out of and in the course of his employment when he fell from a pile of telegraph poles and fractured his right knee.

He was hospitalized and treated, the treatment including an open reduction operation of the knee. Prior to this operation Dr. Mason Romaine of Jacksonville, a cardiologist, examined claimant, who was then 50 years old, and found that he was suffering from a pre-existing vascular heart disease described as an arterio-sclerotic condition — which had no causal relationship to his employment.

As a result of this knee injury claimant suffered temporary total disability from December 4, 1952 until October 26, 1953 when he reached maximum recovery and returned to his job as assistant city foreman. The employer paid him $1,602 — compensation for temporary total disability at $35 a week from December 4, 1952 until October 26, 1953.

While claimant's title was assistant city foreman his actual duties, prior to his injury of December 4, 1952 and after his return to work on October 26, 1953, included strenuous activities, such as lifting and climbing telegraph poles and the installation of heavy objects and equipment.

On Wednesday, March 31, 1954, while working at the Gator Bowl in Jacksonville, he experienced severe pain in his chest and was compelled to rest for about an hour. He thereafter resumed his work and although he still felt pain that day and the following two days he continued to perform his duties until the end of his regular work week, which ended in the late afternoon of April 2, 1954.

On Saturday, April 3, 1954, he became ill at his home after working in his garden that afternoon. He called Dr. Simon D. Doff, who gave him a physical examination at his home, found he was suffering from shortness of breath, severe chest pains with radiation into his arms, that he had an extremely rapid pulse at a rate of 150 heart beats a minute.

Upon physical examination and cardiograph tracings, Dr. Doff found him to be suffering from an acute heart disturbance. Upon his admission to St. Luke's Hospital on Sunday, April 4, 1954, and after further examination and tests Dr. Doff's diagnosis was that he had suffered a coronary thrombosis with myocardial infarction.

Several days after he was admitted to the hospital Dr. Mason Romaine, cardiologist, took over his treatment until he was discharged some time in May of 1954. From his examination and claimant's case history, Dr. Romaine concurred in Dr. Doff's opinion that he had suffered a coronary thrombosis with myocardial infarction.

After his discharge from the hospital and after this claim had been filed Dr. Roy M. Baker, cardiologist, examined him and his case history, and Dr. Karl B. Hansen, cardiologist, examined his case history — both concurred in the opinion of doctors Doff and Romaine that he had suffered a coronary thrombosis with myocardial infarction.

Doctors Doff and Baker were of the opinion that the onset of the coronary thrombosis probably occurred on March 31, 1954, while he was at work. Doctors Romaine and Hansen were of the opinion that the thrombosis did not occur until April 3, 1954, while he was at home.

All the doctors agreed that strenuous and laborious work, of itself, would not bring about the type of heart attack which claimant suffered — but that once a heart attack has occurred strenuous and laborious work would, or could, be detrimental to the already damaged heart.

I find that on April 3, 1954 claimant suffered a coronary thrombosis and that his permanent partial disability, taking into consideration his heart condition and disability of the right leg, amounts to 60% of the body as a whole; that his coronary thrombosis was not caused, precipitated or aggravated by the performance of his work for the employer; that as a result of the injury arising out of the accident on December 4, 1952 he has a 40% permanent partial disability of his right leg; and that at the time he was so injured his average weekly wage was $92.40 — making his rate of compensation $35 a week.

The employer has a pension plan covering its employees, a copy of which has been offered in evidence by stipulation of the parties. On April 11, 1955 the employer retired claimant who on that date accepted a class "B" pension as provided in the plan, and he has been receiving ever since $102.59 per month as a pension.

Paragraphs 20, 21 and 27 of section 9 of the employer's plan specifically provide —

20. Benefits shall not be payable for both accident and sickness at the same time to the same person.

21. Granting a pension to an employee or retiring him from employment without a pension during a period of disability benefits shall not terminate or decrease his disability benefits. Granting a pension during a period of disability benefits, however, shall not qualify the employee for any payments on account of the pension while the disability benefits continue, unless the amount of the pension is greater than the amount of the disability benefits, in which case only such amount shall be paid on account of the pension as may be necessary to make the total amount paid to such employee on account of the disability benefits and the pension equal to the amount he would have received if the pension alone had been paid.

27. In case any benefit or pension shall be payable under the laws now in force or hereafter enacted of any State or Country to any employee of the Company or his beneficiaries under such laws, the excess only, if any, of the amount prescribed in these Regulations above the amount of such benefit or pension prescribed by law shall be the benefit or pension payable under these regulations, and any payment which may have been made under these Regulations shall nevertheless be considered as having been made under such state law and the acceptance of any payment hereunder in such circumstances shall constitute a discharge pro tanto of any obligation existing under such state law and shall be credited thereon and the employee shall upon request execute and deliver any receipt which may be required under such state law. In those cases where because of differences in the beneficiaries, or differences in the time or methods of payment, or otherwise, whether there is such excess

or not is not ascertainable by mere comparison but adjustments are necessary, the Committee in its discretion is authorized to determine whether or not in fact any such excess exists, and in case of such excess, to make the adjustments necessary to carry out in a fair and equitable manner the spirit of the provision for the payment of such excess. Pursuant to the foregoing, the "Primary insurance benefit" payable on or after January 1, 1940 to a Western Union pensioner under the Social Security Act shall be deducted from any pension thereafter payable under the terms of this Plan: and likewise any "lump sum death payment" made under the Social Security Act incident to the death of any employee occurring on or after January 1, 1940, shall be deducted from any death benefit payable under the terms of this Plan; notwithstanding anything contained in Paragraph 27, survivors' insurance benefits under the Social Security Act, payable in monthly installments, shall not be deducted from Western Union death benefits.

The amounts payable by the Company under any law as aforesaid, whether paid directly to the employee or his beneficiaries, or to any other persons, or to any company, commission or State, to provide for the payment of such benefits or pensions shall, on approval of the Committee, be chargeable to the Fund.

A payment made to an employee or his beneficiaries by or under the authority of the laws of any State or Country shall be deemed to be a compensation pension or other benefit payable under the laws of such State or Country within the meaning of this paragraph, whether the payment shall be made direct by the company or out of a fund under the custody and control of the State or a State board to which the employee as well as the company may have contributed.

### Section 440.09 (4), Florida Statutes 1953, is set forth below —

(4) When any employee of the state or of any political subdivision thereof or of any public or quasi-public corporation therein, or any person entitled thereto on account of dependency upon such employee, receives compensation under the provisions of this chapter by reason of the disability or death of such employee resulting from an injury arising out of and in the course of employment with such employer, and such employee or dependent is entitled to receive any sum from any pension or other benefit fund to which the same employer may contribute, the amount of any payment from such pension or benefit fund allocable to any week with respect to which such employee or dependent receives compensation under this chapter shall be reduced by the amount of the compensation for such week; provided that if the amount of the payment from such pension or benefit fund allocable to any week is less than the amount of such compensation for such week only the amount of the pension or benefit payment allocable to such week shall be affected and the amount of the difference between the compensation and the pension or benefit payment allocable to one week shall not reduce the pension or benefit payment allocable to any subsequent week.

The employer contends that in the light of the provisions of the employer's pension plan and of section 440.49 (4) the $102.59

monthly payments which claimant has received since April 11, 1955 are in effect payment toward any benefit he would receive under the Act for the same period.

Section 440.09 (4) applies only to employees of the state or any political subdivision thereof, or of any public or quasi-public corporation. If this employer comes within any of these classifications, it is that of a quasi-public corporation. In my opinion the employer is a quasi-public corporation within the meaning of the Act and the provisions of section 440.09 (4) are applicable in this case — and all compensation payments due and payable to claimant after April 11, 1955 should be reduced by the amount he has received under the pension plan since that date.

Claimant was represented by his attorney, John E. Mathews, Jr., of McNatt & Mathews, and $750 is a reasonable fee for the services rendered in this proceeding.

It is ordered that Western Union Telegraph Co. —

Pay forthwith to claimant, in a lump sum, compensation for 80 weeks at a rate of $35 per week, covering the period commencing October 27, 1953 to and including May 10, 1955 as compensation for his permanent partial disability of 40% loss of use of his right leg, *less* all sums paid to him by the employer under the employer's pension plan for the period between April 11, 1955 and May 10, 1955.

Pay all outstanding and unpaid medical bills incurred in the treatment of claimant's injury of December 4, 1952 and reimburse claimant for any expenditures made by him in this respect.

Furnish claimant such further medical treatment as the nature of his injury or the process of recovery may require.

Pay claimant's attorney $750 as a reasonable attorney's fee for services rendered in this proceeding.

Pay the costs of this proceeding.